FILED

2020 DEC 23  10: 38

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

LEON JOHNSON, )
    Plaintiff, )
)
v. )
)
DUSTIN BLANTON, )
BRANDON BARNHILL, and )
EVERGLADES COLLEGE, INC., d/b/a )
KEISER UNIVERSITY, )
    Defendants. )
_____/

CASE NUMBER: _____

8:20-cv-3069-T-60AAS

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the plaintiff, pro se and brings this action against the Defendants and alleges as follows:

1.      This is a personal action for damages arising from deprivations of Civil Rights under 42 U.S.C. § 1981 as amended and other laws of Rights under the Constitution of the United States, and as more fully set out below for violation of the Fourteenth Amendment.  Leon Johnson (hereinafter referred to as plaintiff) seeks redress for the Defendants' retaliatory and discriminatory actions and damages for the personal injuries sustained by the Plaintiff as a direct and proximate result of the wrongful conduct, wrongful termination and civil conspiracy in connection with his employment.

### JURISDICTION AND VENUE

2.      Jurisdiction is inferred upon this Court by 42 U.S.C. § 1981.

3.      Venue is proper in this United States Judicial District pursuant to 13 U.S.C. § 1391 because Leon Johnson resides in this judicial district, Keiser University's Tampa

1


P4 $402.00
12/23/2020
TPA062755

campus is located in this judicial district, the events giving rise to the claims against the defendants occurred in this judicial district, and the defendants' actions giving rise to this suit have had a substantial effect on parties in this judicial district.

## THE PARTIES AND THEIR RELATIONSHIP

4. At all relevant times herein, Plaintiff was and is a citizen of the United States as well as the State of Florida and is a resident of Hillsborough County, Florida. At all relevant times herein, plaintiff was employed at Everglades College, Inc. as an instructor at its Keiser University Tampa campus located at 5002 West Waters Avenue, Tampa, Florida 33634.

5. Defendant Everglades College, Inc. ("Everglades College, Inc.") is a Florida corporation organized under the laws of the State of Florida and Hillsborough County, Florida, and at all times material to this complaint was plaintiff's employer. Everglades College, Inc., doing business as Keiser University ("Keiser University"), is a private, non-profit Florida university offering undergraduate and graduate programs across twenty campuses in numerous cities, including Tampa, in the state of Florida.

6. Defendant Dustin Blanton ("Blanton") is an employee of Everglades College, Inc. and is the dean of academic affairs at Keiser University's Tampa campus located at 5002 West Waters Ave, Tampa, Florida, 33634 and at all times hereto was employed in that capacity.

7. Defendant Brandon Barnhill ("Barnhill") is an employee of Everglades College, Inc. and is the campus president of Keiser University's Tampa campus located at 5002 West Waters Ave, Tampa, Florida, 33634 and at all times hereto was employed in that capacity.

2

8.      All defendants conduct significant levels of educational and commercial activity within Hillsborough County, Florida and within the State of Florida in general.

## PLAINTIFF'S ALLEGATIONS

9.      Plaintiff was hired by Keiser University in or about 2010 as the sole fulltime instructor in the Crime Scene Technology associate's degree program (ASCST). The Crime Scene Technology program is an associate's degree program which prepares a student for employment as a crime scene investigator. Plaintiff has over 25 cumulative years of extensive practical experience, education and training in criminal investigation, forensic investigation, criminal law, law enforcement, criminal evidence, higher education, and College Board curriculum development.

10.     Due to plaintiff's knowledge, experience, education and training, in addition to teaching the 9 core program courses in the Crime Scene Technology curriculum, plaintiff also taught classes in the bachelor's level programs of Forensic Investigations, Criminal Justice, Legal Studies, and Paralegal. Plaintiff was the only instructor on the Tampa campus credentialed to teach in all 5 criminal justice-related disciplines. Plaintiff taught a 4-week course every month in the 12-month academic year for nine years, on occasions teaching a "double load" of a day course and a night course.

11.     Plaintiff sought to develop Keiser University's visibility in the community by such measures as lecturing on forensic investigation at the University of Tampa's Criminology Club and initiating a valuable relationship between Keiser University and the F.I.R.S.T. research lab, a cutting-edge forensic research facility located in neighboring Pasco County.

3

12.     During the nine years plaintiff was employed at Keiser University, plaintiff received exemplary performance ratings.

13.     The Crime Scene Technology program grew during plaintiff's stewardship due largely to plaintiff's efforts, including conducting numerous high school workshops on campus throughout the year, attending high school functions and graduation ceremonies, and creating strong connections with the students in his program, working diligently to provide them with the skills and knowledge to successfully apply for positions upon graduation.

14.     Currently, even after plaintiff's separation from Keiser University, graduates continue to contact plaintiff to seek his opinion on matters of employment opportunities and career choices.

15.     The Crime Scene Technology associate's level courses served as the required associate's level courses for students seeking a bachelor's degree in the Forensic Investigations (BSFI) program.  As the Crime Scene Technology program grew under plaintiff's leadership, so did the Forensic Investigations program.

16.     Sassan Hedeyat is the main instructor in the Forensic Investigations bachelor's degree program at Keiser University's Tampa campus.  Hedayat graduated from college in 2010 and was hired by Keiser University in 2011.

17.     Hedayat has never worked in a forensic lab in either a law enforcement agency nor an investigative agency.  Unlike plaintiff, he has no actual, practical or hands-on experience of any kind pertaining to crime scene investigation techniques or forensic evidence examination.  He has never touched, collected, examined, packaged or

4

transported forensic evidence, nor has he participated in an actual criminal investigation.

18.     James Vricos is the associate dean over the Crime Scene Technology (ASCST) and the Forensic Investigations (BSFI) programs at Keiser University's Tampa campus.

19.     In December of 2013, plaintiff was requested by then-Dean of Academic Affairs Karen Habblitz to begin teaching a new hybrid format which combined the online Blackboard course management system with a traditional classroom component.

20.     Plaintiff agreed to undertake the task and, during the 2013 Christmas holiday break, plaintiff was granted access to an online Blackboard shell.  During the holiday break, plaintiff taught himself to utilize Blackboard and how to infuse curriculum material into the course management system.  In January 2014, after classes resumed, plaintiff became the first and only instructor on the Tampa campus to instruct classes using a hybrid format.  Plaintiff continued to receive exemplary performance ratings after he began teaching in the hybrid format.

21.     In early 2017, Hedayat advised plaintiff that Les Wehman, a white female who had earlier been an associate dean at the Tampa campus, and Samuel Sparks, a white male who was then and currently is the Dean of Academic Affairs at the Orlando campus of Keiser University, had both advised Hedayat that the Keiser University Orlando campus Program Director position over the programs of Crime Scene Technology, Forensic Investigations, Legal Studies, Paralegal Studies and Criminal Justice was his (Hedayat's) if he wanted it.

22.    Hedayat further advised plaintiff that both Wehman and Sparks warned Hedayat that the information they gave him about the Orlando Program Director's position being his if he wanted it "goes no farther than the door" and "doesn't leave this room."

23.    The Orlando campus Program Director position, at the time it was offered to Hedayat, was not listed as an opportunity in the Keiser University career website.

24.    On or about February of 2017 Blanton and Barnhill, without making the position opportunity known to plaintiff and without affording plaintiff the opportunity to apply to the position, promoted Hedayat to a supervisory position over plaintiff, making Hedayat the supervisor over both the Crime Scene Technology and the Forensic Investigations programs at the Tampa campus.

25.    As a result of Hedayat's promotion, plaintiff was to begin reporting directly to Hedayat, who had been employed at Keiser University a shorter period of time than plaintiff.    The Tampa supervisory position Hedayat was promoted to was not listed as an opportunity in the Keiser University career website at the time of Hedayat's promotion.

26.    Hedayat, who is not African-American, at the time of his appointment as plaintiff's supervisor had no experience or training in the areas of maintaining or securing forensic evidence in a law enforcement facility, forensic evidence report writing, responding to subpoenas, conducting searches for forensic evidence at a crime scene, interacting with police personnel at crime scenes, or maintaining the chain of custody of forensic evidence. Hedayat had never examined forensic evidence in a criminal investigation or any other type of investigation.

6

27.  Hedayat, at the time of his appointment as plaintiff's supervisor, had never worked in a forensic laboratory, had no experience or training in criminal procedure issues, laws of criminal evidence, courtroom procedure or testimony, 4th amendment search and seizure restrictions, the recovery and packaging of forensic evidence from crime scenes, medico-legal terminology and restrictions, search warrant requirements or extended crime scene searches.

28.  Hedayat, at the time of his appointment as plaintiff's supervisor, had never been at an actual crime scene, had never testified in a deposition or trial, had never participated, in any manner, in a criminal investigation, had never touched, handled or examined any item of physical or forensic evidence in a criminal investigation, had never testified as a forensic investigator or forensic evidence examiner in a court of law, and had never searched for, examined, packaged nor transported forensic evidence to a lab facility.

29.  After being advised of Hedayat's promotion, plaintiff, who shared an office with Hedayat, was advised by Hedayat that plaintiff would begin reporting directly to him. Plantiff then advised Hedayat that he (plaintiff) was going to request a meeting with Blanton regarding Hedayat's promotion and would seek further explanation as to how Hedayat became plaintiff's supervisor without the opportunity being listed in the Keiser University career opportunities website.

30.  At that moment Hedayat became noticeably nervous, immediately pivoted to shield his actions from plaintiff, and began to send a text message on his phone. Approximately 55 seconds later, following Hedayat's text message, Blanton suddenly appeared at plaintiff's office door.

31.     Upon Blanton's sudden, unexpected arrival, plaintiff asked Blanton what procedure was followed in promoting Hedayat as plaintiff's supervisor. Plaintiff also advised Blanton that plaintiff had vastly more experience, education and training than Hedayat in the areas Hedayat would supervise, and requested that Blanton explain Hedayat's promotion as plaintiff's supervisor without plaintiff being advised of the position opportunity and without the position being advertised on the university's career website. Plaintiff also questioned Blanton as to what had prompted him to suddenly come to plaintiff's office.

32.     Blanton initially denied and then later admitted to plaintiff that he had come to plaintiff's office because Hedayat had texted him. In response to plaintiff's question as to why Blanton had not given plaintiff the opportunity to apply for the supervisor vacancy, Blanton hesitated for several seconds and then responded that there were "people who were uncomfortable" with plaintiff. Plaintiff, who was one of the few full-time African-American instructors on the Tampa campus, then asked Blanton to explain further what he meant by the term uncomfortable. Blanton declined to answer.

33.     Plaintiff then stated that Blanton had discriminated against plaintiff because of his race. Blanton did not deny or refute the charge. Plaintiff also asked Blanton what had prompted him to promote Hedayat. Hedayat then stated to no one in particular that he wished to leave the room. After a long pause during which he seemed to be searching for an answer, Blanton stated that the reason he promoted Hedayat as opposed to plaintiff was because Hedayat was a member of the CRT (Campus Response Team) and plaintiff was not.

34.    The CRT is wholly comprised of volunteer employees who respond to an emergency situation on campus.  As there was no public address system located on the campus, the response of the CRT members was requested and coordinated via small walkie-talkie radios that each CRT member was required to carry on his/her person the entire time they were on campus.  Additionally, each CRT member was required to wear a red CRT lanyard around their neck that readily identified them to other personnel, staff and students as a CRT member.

35.    In the past Hedayat had expressed to plaintiff his unwillingness to be readily identified as a CRT member because he was afraid if "something happened" he could possibly become a "target."  Hence, although Hedayat was a CRT member, while on campus he never carried the walkie-talkie radio with him, nor did he wear the CRT lanyard.  The walkie-talkie always sat in its charging station on Hedayat's desk unless Hedayat was about to attend a CRT meeting.  The red lanyard always hung on a hook on a wall in his office. On days a CRT meeting was scheduled, Hedayat would pick up the walkie-talkie and don the CRT lanyard before leaving to attend the meeting.

36.    On several occasions, while Hedayat was somewhere on campus, the plaintiff heard requests on the walkie-talkie for CRT members to respond to a situation on campus. Hedayat never heard or responded to those requests because he never carried the walkie-talkie with him.  Hedayat was never disciplined by Blanton, Barnhill or Vricos for his failure to follow the rules and regulations of the CRT team.

37.    When Blanton told plaintiff of the CRT requirement for promotion, plaintiff responded that plaintiff had never seen any written notice in Keiser University employee guidelines, nor had plaintiff ever been verbally advised, that CRT

9

membership was a Keiser University prerequisite for promotion. Blanton admitted to plaintiff that CRT membership was not a requirement for promotion and that he had been untruthful when he informed plaintiff that plaintiff's non-CRT membership was a factor in plaintiff not being given the opportunity to apply for the position Hedayat had been appointed to.

38.     Blanton also admitted that the supervisory position had not been listed as an opportunity in the Keiser University career website and again refused to explain what he had meant by the term "uncomfortable" in his reference to plaintiff. Blanton also admitted that when compared to Hedayat, plaintiff had extensively more practical experience, education and training in the program disciplines that Hedayat would be supervising.

39.     Blanton, of his own volition, with no questioning from plaintiff, also stated to plaintiff that Hedayat had an "anger management problem."

40.     Plaintiff again advised Blanton that it was obvious that the decision to covertly promote an inexperienced white individual with "anger management issues" like Hedayat as plaintiff's supervisor despite plaintiff's more extensive training, education and experience was due to Blanton's discrimination against plaintiff due to plaintiff's race. Blanton again made no statements to deny or refute plaintiff's statement.

41.     Although people of color made up a significant percentage of the student body, plaintiff was one of the few fulltime African-American instructors on the Tampa campus. There were no African-American supervisors on the Tampa campus.

42.    As a result of plaintiff's objection to Blanton's discriminatory actions against plaintiff and the improper promotion of Hedayat, a hostile work environment was created which continued and culminated in plaintiff's termination.

43.    Several days after plaintiff had objected to Blanton's discriminatory actions against plaintiff and the improper promotion of Hedayat, Campus President Brandon Barnhill, without notice, as Blanton had done several days earlier, randomly stopped by plaintiff's office.

44.    While in plaintiff's office, although plaintiff had not previously discussed Hedayat's promotion with Barnhill in any manner, and without any precursor to the topic, Barnhill suddenly and aggressively stated that minorities frequently complained about discrimination and racism in the workplace, that minorities were always wrong about the perceived discrimination, and that racism didn't actually exist.

45.    Barnhill's unwarranted, aggressive statement to plaintiff was intended to intimidate plaintiff and to threaten plaintiff in regard to plaintiff's discrimination complaint to Blanton regarding his promotion of Hedayat.

46.    After plaintiff objected to Hedayat's promotion, plaintiff was often assigned to multiple pre-registration clerical duties during both daytime and evening hours, despite teaching classes each and every month, while other white instructors, including those not teaching a class that month, were not assigned to participate in any pre-registration duties.

47.    After the previously mentioned occurrences had taken place, Hedayat enjoyed many of the privileges and information resources of supervisory personnel, including but not

11

limited to, being knowledgeable about other employees' personnel records and personal history, their disciplinary history, and their salaries.

48.    Hedayat, after the previously mentioned occurrences, often knew of faculty-wide rule changes or campus announcements prior to Blanton making the official declarations at faculty meetings. Other faculty members often remarked how Hedayat "knew everything."

49.    Hedayat stated to plaintiff that two Keiser University employees, Gabriel Issacs and Kevin Kreighbaum, both white male employees, had each failed to clock into work for one full month and that no disciplinary actions had been taken against them. Daily clock-in is a requirement for all of Keiser University's employees on its Florida campuses.

50.    Hedayat frequently had meetings with Blanton and/or the registrar without plaintiff being invited to the meeting. During the meetings, matters such as curriculum development in the Crime Scene Technology and Forensic Investigations programs, as well as student placement and student schedule changes, were discussed.

51.    During this time frame, Blanton would hold meetings with Hedayat in which he sought Hedayat's input and opinion regarding students who were in plaintiff's classes despite Hedayat having no knowledge of the students' capabilities or academic progress.

52.    After the meetings, Hedayat would advise plaintiff of the decisions made in the meeting as it applied to the Crime Scene Technology and Forensic Investigations programs.

53.      Hedayat, as a ruse to induce plaintiff to make negative comments about both Blanton and Barnhill, would often make critical, disparaging comments about them to plaintiff. Hedayat routinely criticized Blanton, making negative comments on his wardrobe, his lack of managerial experience and his weight gain. Hedayat would also make negative comments about Barnhill, deriding his possessing "only" a bachelor's degree as a campus president, mocking his oratorical skills during campus ceremonies and his extensive salary. Hedayat stated to plaintiff that Barnhill would also, at intervals, ask him what he (Hedayat) thought of Blanton's job performance as academic dean.

54.      Hedayat advised plaintiff that an adjunct instructor who had been assigned to teach an evening Forensic Chemistry course in Hedayat's Forensic Investigations program had difficulty completing the mandatory online hybrid instruction course that instructors were required to pass prior to teaching a hybrid class. The adjunct instructor also had difficulty understanding the Blackboard class management system.

55.      Hedayat explained to plaintiff that, in order to circumvent the rule requiring the adjunct instructor to complete the hybrid instruction course, an associate dean had actually taken the online course after logging in as the adjunct instructor. According to Hedayat, he (Hedayat) then created and infused all of the Forensic Chemistry course curriculum into the Blackboard system in the instructor's name. Hedayat laughed while advising plaintiff of his actions.

56.      At one point, Blanton ordered all personnel teaching 4-credit-hour hybrid courses to increase their classroom instruction hours from 4 hours to 5 hours for each class meeting. Hedayat advised plaintiff that he had told Blanton that he saw no legitimate

13

justification for the additional hour and that Blanton's response had been "Okay. Do what's best for your students."

57. Hedayat admitted to plaintiff that on occasions he disliked teaching a particular Digital Imaging course in his curriculum and that he had simply reconfigured his teaching assignment schedule and the class schedules of BSFI students to delay his having to teach the course.

58. Blanton and Barnhill gave Hedayat the supervisory authority to manipulate and reconfigure his BSFI program's course structure, to change the class schedules of students in his Forensic Investigations program and to place Keiser University students from other bachelor's degree programs in his BSFI courses in order to "cobble" together a specific class roster configuration.

59. Blanton and Barnhill gave Hedayat the supervisory authority to "cobble" together class rosters to make his BSFI classes appear to comply with the accreditation rules and regulations Keiser University was required to follow by the Southern Association of Colleges and Schools Commission on Colleges (SACS), an accreditation organization recognized by the U.S. Department of Education.

60. Supervisors did not teach a full academic load and frequently, Hedayat, although a fulltime employee, had several months during the 12-month academic year when he taught no classes. The result was that he would often teach 7 courses or less in a 12-month academic year, although other personnel who taught 7 classes or less per year were classified as parttime or adjunct employees. For the five idle months in which he taught no classes, including the academic terms where plaintiff taught a double load, Hedayat often spent the bulk of his work day watching movies or sports on his personal

14

laptop in his office with the door locked, or socializing with other supervisory personnel.

61.      At some point during the academic year, Hedayat advised plaintiff that Blanton had decided not to follow the official protocol and timeline issued by the University Department Chair pertaining to major changes in the BSFI and ASCT programs and further advised that plaintiff's job was dependent on plaintiff "going along" with Blanton's decision.

62.      At intervals beginning in 2017, Blanton would advise plaintiff that a Program Director supervisory position over the programs of Crime Scene Technology, Forensic Investigations, Paralegal Studies, Legal Studies and Criminal Justice was going to be announced in the near future.

63.      On each occasion that Blanton advised plaintiff of the upcoming opportunity, Blanton would question plaintiff as to whether plaintiff would be applying for the position.    Each time plaintiff answered yes.    Each time, after plaintiff's acknowledgement that he would apply for the position, the position never materialized.

64.      Plaintiff, the only African-American employed fulltime in one of the criminal justice-related programs at the Tampa campus, was the only instructor employed at the Tampa campus who had extensive education, training and experience in all of the 5 program disciplines that the proposed directorship would supervise and he was the only instructor who had experience teaching in all 5 of the programs at the Tampa campus.

65.      Plaintiff was also the only Keiser University instructor at the Tampa campus who was ever questioned regarding his (plaintiff's) intention to apply for the Program Director's position when it became available.  No white instructors who taught in any

15

of the 5 criminal justice-related programs were ever questioned as to whether they would apply for the upcoming Program Director vacancy.

66.    The continuing discriminatory practice of the promotional opportunity being withdrawn upon Blanton learning that plaintiff, an African-American, would apply to the position was a continuing violation of plaintiff's constitutional rights over several years. Blanton made it clear that he would not give plaintiff the opportunity to apply for the supervisory position and that his decision was based on plaintiff's race. The practice continued up to the time of plaintiff's termination.

67.    Prior to plaintiff's termination, plaintiff began to receive an increasing number of complaints from his students that were enrolled in the Forensic Investigations program (BSFI), particularly:

   a.   Students weren't sure whether they were enrolled in the BSFI Investigation concentration or the BSFI Science concentration. Students advised that the two concentrations were the only two that were offered at the Tampa campus according to the 2017-2018 Keiser University Undergraduate Catalog. Several students advised plaintiff that the availability of the two concentrations on the Tampa campus was the reason they had chosen to enroll at Keiser University.

   b.   Students weren't certain that the BSFI program was actually providing them with the science-related courses necessary to qualify for employment at analytical or forensic laboratories, as they had been told by Keiser University staff and personnel. Most of plaintiff's students that were enrolled in the BSFI program were hesitant to work as crime scene investigators due to the graphic

16

nature of violent crime scenes and had decided to obtain the BSFI degree to qualify them to work in analytical laboratories.

c. Students didn't understand why their schedules didn't list the specific BSFI concentration they were in and students would on occasions argue between themselves as to which BSFI programs were available to them.

d. Students didn't understand why certain ASCT and BSFI courses were listed as 3-credit hour courses in the student handbook yet they had been charged for 4-credit hour courses.

68. As plaintiff was not involved in the curriculum development or the management of the BSFI program and was not qualified to answer detailed questions about the program, plaintiff directed the students to seek out clarification about the BSFI programs from the Registrar's Office, the associate deans, and Hedayat, the main instructor of the core courses in the BSFI program. Plaintiff also advised students to get printed copies of their class schedules from the Registrar's Office.

69. Plaintiff's students continued to express their frustrations. Despite their monthly pre-registration meetings with the Registrar's Office and the advisory staff, the students' schedules still did not show the specific concentration they were in. Examples of the inconsistent information they received were:

a. Students stated they had been advised by Associate Dean James Vricos that their program questions could best be answered by Hedayat, due to "his vast experience in the field."

b. A student advised that Vricos told her she had successfully been transferred from a business degree program to the BSFI Investigation concentration. Vricos'

17

documented comments in the student's record confirmed that Vricos had made that exact statement to her. Plaintiff later learned, in contrast to Vricos' assertion, that the student's academic records showed that she had been placed in the "old" BSFI program rather than the Investigation concentration.

c. Another student advised plaintiff she was in the BSFI Investigation concentration. Her official academic record confirmed her belief, detailing she had indeed been taking classes in the Investigation concentration for six months. Plaintiff learned that Blanton later spoke with her and advised her that she had *always* been in the "old" BSFI program. The student's academic record reflected that after Blanton spoke with her, person(s) unknown had transferred her from the BSFI Investigation concentration to the "old" program. There were no explanations or reasons placed in the official record for the student's program transfer.

d. Several students were advised by associate deans that there were three BSFI programs on the Tampa campus to choose from and were given "audit sheets" in confirmation of the programs being offered. Contrary to that assertion, plaintiff heard Hedayat advise one such student, who had earlier left a meeting with an associate dean, that he was "not offering all the programs yet."

e. A student graduating from plaintiff's ASCT program who aspired to eventually apply to medical school was told by an advisor, after the advisor examined the BSFI Science concentration program "audit sheets," that the student should be and would be enrolled in the Science concentration because of the upper level "hard science" courses in physics, microbiology and molecular biology that were

18

part of the BSFI Science concentration courses taught. The student's academic records later showed the student had been enrolled in the "old" BSFI program.

    f.  Later, plaintiff, upon reviewing another student's record in the official Keiser University academic record system, was able to confirm that the student had been placed in the BSFI Science concentration program since their initial Keiser University enrollment several months earlier, and that the student was actively taking lower-level classes in the Science concentration. Person(s) unknown later transferred the student to the Investigation concentration, with no documented student request or institutional explanation or reason for the change being recorded in the student's Campus Nexus/Campus Vue record.

The program concentration transfer from Science to Investigation added additional courses to the student's schedule, and the financial aid office notified him that the added courses would cause him to be considered a fulltime student. As such, he would be required to obtain additional funding and would need to apply for a new student loan. The student's request to move the additional courses further back in his schedule was denied, and the student, who had a fulltime job and was the father of a small child, withdrew from Keiser University a short time later.

70.    Hedayat had advised plaintiff on multiple occasions that he had personally spoken with former college classmates who were employed as laboratory analysts at the Florida Department of Law Enforcement (FDLE) and they had advised him that the minimum educational requirement to become employed at their laboratory, or any other

analytical laboratory, was a bachelor's degree in a "hard science" such as Physics, Chemistry or Biology.

71.     Plaintiff accompanied a student to the Registrar's Office and observed the student ask the associate registrar what BSFI concentration the student was enrolled in. The associate registrar, in the space of 1 minute, nervously gave the student 3 conflicting answers, in the following order:

    a. Only one BSFI concentration was offered at the Tampa campus

    b. A student's concentration depended on the transfer credits the student had

    c. Hedayat determined what BSFI concentration the student was placed in

72.     Blanton and Barnhill, during faculty meetings, frequently attested to the need for faculty members to place accurate, timely and detailed information in the Campus Nexus/Campus Vue academic record documentation system used by Keiser University and that failure to do so would lead to disciplinary action.

73.     Blanton and Barnhill consistently explained that it was vital that the official academic records reflected accurate, factual data pertaining to such academic areas as the particular classes an instructor taught, student pretest and posttest scores, student grades, student attendance and other similar information.

74.     On numerous occasions during faculty and staff meetings, both Blanton and Barnhill gave anecdotal accounts of adversarial encounters with students and/or the parents of students pertaining to a student's academic record and how the accurate information detailed in Campus Nexus/Campus Vue regarding a student's academic history (program enrollment and participation, attendance, grades, activities, program transfer, etc.) had served to refute any accusations made by the student.

75.     Samuel Sparks, during the period he was an associate dean at the Tampa campus, also frequently implored the staff to put accurate, truthful information in Campus Nexus/Campus Vue because the information placed therein was, as he explained it, *"subpoena-able."*

76.     Blanton and Barnhill also frequently encouraged faculty members to routinely examine, review and update the Campus Nexus/Campus Vue records for accuracy regarding the programs they taught in, the specific classes they taught and the academic records of the students in their programs.  On occasions during faculty and staff meetings Blanton enthusiastically encouraged those in attendance to give a hearty round of applause to a faculty member who had placed clear, detailed and factual information in the Campus Nexus/Campus Vue record system regarding a student's curriculum, grades, attendance, etc.

77.     As a direct result of the BSFI students in plaintiff's Crime Scene Technology classes showing increasing frustration and confusion about their education, plaintiff, as per Blanton's and Barnhill's direction, accessed the Campus Nexus/Campus Vue record system to determine if he could assist students in their attempts to eliminate the confusion concerning their classes, their schedules and the BSFI program concentrations they were enrolled in.

78.     While examining Keiser University's official Campus Nexus/Campus Vue records in order to address the academic concerns of plaintiff's students, plaintiff learned that students were enrolled in the BSFI Investigation concentration, in the BSFI Science concentration and some were enrolled in the "old" BSFI program.  The students in all

three concentrations were actively taking classes, in direct contrast to the earlier statements made by the associate registrar and Hedayat.

79. During plaintiff's review of his students' schedules, plaintiff also discovered that in the 2018 Fall D term, Blanton, Barnhill and Vricos had assigned instructor Luis Fernandez to teach Forensic Biology, a required course in the curriculum of all three BSFI Forensic Investigations programs. The classes had been held from 6:30 p.m. to 10:30 p.m. in room 221 on the second floor of the Tampa campus from the dates of November 19, 2018 to December 16, 2018.

80. Fernandez is a fulltime instructor at Keiser University's Tampa campus, as was the plaintiff. Fernandez, who is not African-American, was assigned as the sole instructor of record for the 2018 Fall D term Forensic Biology course in all official Keiser University Campus Nexus/Campus Vue documents and records, and he was designated as the Tampa instructor who had taught the course in the official class schedules of all of the students enrolled in the Forensic Biology course.

81. Plaintiff learned that Fernandez did not properly conduct a posttest review for the 2018 Fall D term Forensic Biology course.

82. Plaintiff also learned that although Luis Fernandez had been assigned to teach the 2018 Fall D term Forensic Biology course and was required to properly administer a pretest and posttest, Fernandez did not assign, administer or grade any pretests or posttests for the students in the course that Blanton, Barnhill and Vricos had assigned him to teach.

83. However, Fernandez falsely and fraudulently documented in multiple official Keiser University records in Campus Nexus/Campus Vue that he *had* properly

22

administered the pretests and posttests for the 2018 Fall D term Forensic Biology course and he then fraudulently posted student pretest and posttest scores for the course.

84.    Plaintiff also learned that on the first day of class for the 2018 Fall D term Forensic Biology course, Fernandez spoke to the students for approximately 45 minutes and afterwards was not physically present for any further Forensic Biology classes. He did not determine class attendance on that day nor was he present to determine class attendance for any of the remaining classes that Blanton, Barnhill and Vricos had assigned him to teach.

85.    However, despite his own absences, Fernandez falsely and fraudulently documented in multiple official Keiser University records in Campus Nexus/Campus Vue that he had been present for each class meeting, that he had properly and accurately taken attendance for each class meeting, and that he had properly and accurately recorded the class attendance for the 2018 Fall D term Forensic Biology course on the Tampa campus. He did not, however, complete and submit the mandatory, hand-written weekly Attendance Roster to the Registrar's Office.

86.    Plaintiff also learned that Luis Fernandez did not teach any of the 2018 Fall D term Forensic Biology classes. Other than briefly addressing the class for approximately 45 minutes during the 1st class meeting of the 4-week course, he was absent for the rest of the term, and he never entered classroom 221 again.

87.    Fernandez did not instruct, lecture or teach any Forensic Biology classes and he did not administer or grade any pretests, posttests, quizzes, midterms or final examinations. He did not give reading assignments, mentor students, review grade statuses, assign homework, conduct lab or practical exercises, generate curriculum material, online or

23

on ground, in any manner, for the 2018 Fall D term Forensic Biology course he had been assigned to teach by Blanton, Barnhill and Vricos.

88.     However, Fernandez falsely and fraudulently documented in multiple official Keiser University records in Campus Nexus/Campus Vue that he *had* taught each class for the 2018 Fall D term Forensic Biology course and had successfully completed all of the duties and responsibilities required of an instructor.

89.     Fernandez willfully, deliberately and fraudulently placed pretest scores, posttest scores, midterm grades, final examination grades, final course grades and attendance statistics in official Keiser University Campus Nexus/Campus Vue records.  He falsely documented that he had been present for and had taught each class and had conducted each lab exercise for the 2018 Fall D term Forensic Biology course Blanton, Barnhill and Vricos had assigned him to teach.

90.     In direct violation of Keiser University policy, Luis Fernandez did not create and maintain a Blackboard shell nor a digital gradebook for the Forensic Biology course. Additionally, he did not create any online content or curriculum for the students, nor did he create and maintain a mandatory handwritten gradebook for the 2018 Fall D term Forensic Biology course, although he was solely designated as the course instructor of record in Campus Nexus/Campus Vue.

91.     Fernandez did not create nor maintain a mandatory lesson plan, nor did he attend any mandatory meetings with any supervisor to submit and discuss his lesson plans for the Forensic Biology course during the 2018 Fall D term. Supervisors are required to schedule specific date and times to meet with instructors during and after an academic term to discuss and review the instructor's weekly lesson plans.

24

92.     Neither Blanton, Barnhill nor Vricos scheduled mandatory lesson plan meetings with Fernandez to discuss the status of the 2018 Fall D term Forensic Biology course, the percentage breakdowns of the roster grades, and his lesson plans for the Forensic Biology class they had assigned him to teach, either during or after the 2018 Fall D term, a clear violation of supervisory responsibilities.   The lesson plan meetings between supervisors and instructors are mandatory for all instructors on the Tampa campus.

93.     Luis Fernandez did not administer a final examination for the 2018 Fall D term Forensic Biology course that Blanton, Barnhill and Vricos had assigned him to teach. Fernandez, however, falsely and fraudulently documented in multiple official Keiser University records that he *had* administered and graded a final examination for the 2018 Fall D term Forensic Biology course.

94.     Fernandez then fraudulently entered final course grades in multiple documents in the official Keiser University Campus Nexus/Campus Vue records for the 2018 Fall D term Forensic Biology course that Blanton, Barnhill and Vricos had assigned him to teach.

95.     At the end of the 2018 Fall D term, Luis Fernandez did not, sign, date and submit the mandatory handwritten 2018 Fall D term Forensic Biology "Final Grades Work Sheets," nor did he submit the mandatory End-of-Course packet for the 2018 Fall D term Forensic Biology course to the Registrar's Office.  The documents were required to be submitted on or before Monday, December 17, 2018.

25

96.     Fernandez violated Keiser University policy by failing to meet with Blanton, Barnhill, Vricos or any other supervisor to discuss the results of the mandatory 2018 Fall D term Forensic Biology end-of-course student surveys.

97.     On or about January of 2019, plaintiff personally asked Luis Fernandez if he had taught the evening 2018 Fall D term Forensic Biology course from November 19, 2018 to December 16, 2018 that Blanton, Barnhill and Vricos had assigned him to teach on the Tampa campus.

98.     Fernandez replied to plaintiff that he had not taught the course and that he had only addressed the students for a brief time on the first day of class, advising them he might seem them again if they ever took his Human Anatomy and Physiology course.

99.     Blanton, Barnhill and Vricos were and are fully knowledgeable of Fernandez' multiple violations of Keiser University policies and documentation rules pertaining to pretests, posttests, grading, examinations, instructor attendance and student attendance. They were and are fully aware of all of his egregious violations of instructor responsibilities and duties, including Fernandez' gross failure to teach the course Blanton, Barnhill and Vricos had assigned him to attend and teach.

100.    Blanton stated under oath, on August 8, 2019, during an appeal to contest plaintiff's receipt of unemployment benefits, that he (Blanton) agreed with and enforced the Keiser University policy in the employee handbook that states "a deliberate omission, falsification, or fraudulent alteration of any document or record is grounds for immediate dismissal."

101.    Fernandez, who is not African-American, was not disciplined or reprimanded in any manner, nor was he terminated by Blanton, Barnhill or Vricos, despite their full

26

awareness of his multiple violations of Keiser University faculty policies as well as his deliberate omissions, falsifications and fraudulent alterations of official Keiser University documents and records.

102. During the 2019 Winter D term module that took place from April 1, 2019 to April 28, 2019, Blanton assigned plaintiff to teach a "double load" of two courses: a day Crime Scene Technology class and an evening Criminal Justice class.

103. For both courses, as per Keiser University rules and procedures, plaintiff:

a. administered and graded the pretests and posttests, using the same posttest review and administration procedures plaintiff had used for all the twelve courses plaintiff had taught each academic year for nine years. As per Keiser University rules and procedures, plaintiff properly documented the scores in Campus Nexus/Campus Vue, in the Blackboard system and in plaintiff's handwritten gradebook.

b. created and maintained a lesson plan, a Blackboard shell, a digital gradebook, created online content, and maintained a handwritten gradebook.

c. was present for each class, took roll and properly and accurately documented the attendance in Campus Nexus/Campus Vue, in the weekly signed-and-dated Attendance Roster, in the Blackboard system, and in plaintiff's handwritten gradebook, as per policy.

d. was present for and conducted each class, took attendance, gave lectures, monitored student progress, advised students, administered quizzes, tests, midterms and exams, created online content, created reading and essay assignments, conducted practical exercises, supervised field trips and successfully completed all of the duties and responsibilities of a fulltime instructor. Plaintiff's 5-student evening

Criminal Justice class was absent for the last class, April 25, 2019. Plaintiff was present and appropriately documented each student as absent in Campus Nexus/Campus Vue, in the Blackboard system, in the Attendance Roster and in plaintiff's handwritten gradebook.

e. met bi-weekly with his supervisor to discuss the status of his courses, the percentage breakdowns of the roster grades, and his lesson plans, including the pretest scores, posttest scores, and the final course grades of his students.

f. reviewed for and administered final examinations, using the same final examination review and administration procedures plaintiff had used for all the twelve courses plaintiff had taught each academic year for nine years. Plaintiff properly documented the scores in Campus Nexus/Campus Vue, in the Blackboard system and in plaintiff's handwritten gradebook.

g. properly submitted all the required end-of-course documents.

h. reviewed his end-of-course student surveys with Associate Dean James Vricos who had praised plaintiff's teaching of the evening Criminal Justice course with the phrase "good job" typed on the survey sheet.

104.    On or about the third week of April 2019, plaintiff was summoned to a meeting with Associate Dean James Vricos. During the meeting Vricos repeated Blanton's continuing assertion that a Program Director's position over the Crime Scene Technology, Forensic Investigations, Paralegal Studies, Legal Studies and Criminal Justice programs was soon going to be available. Vricos, as had Blanton on each prior occasion the statement was made to plaintiff, asked plaintiff if he would apply for the

28

position when the opportunity was announced. Plaintiff answered that he would apply for the position. Vricos, like Blanton, never asked white instructors if they would apply to the Program Director position.

105.    Shortly thereafter, as plaintiff left Vricos' office, Blanton, whose office shared a common wall with Vricos' office, suddenly appeared a short distance down the hallway from Vricos' office. Blanton then repeated his ongoing assertion that the Program Director position was soon going to become available and asked plaintiff to "confirm the statement you (plaintiff) just made to Dean Vricos" regarding plaintiff's intent to apply for the position.

106.    At that moment plaintiff realized that Blanton had apparently been listening to plaintiff's conversation with Vricos from his office. Plaintiff again answered that he would apply for the position. Blanton then clenched his right fist in exultation, laughed and walked back into his office.

107.    No other instructors, all of whom were non-African-American, were questioned as to whether they would apply for the upcoming director vacancy. Several weeks later plaintiff was terminated.

108.    On or about May 6, 2019, Blanton requested a meeting with plaintiff in the office of James Vricos. Plaintiff arrived at the meeting and a few minutes later Blanton arrived and immediately advised plaintiff that plaintiff had violated Keiser University policies regarding administering examinations in the evening Criminal Justice course. Blanton and Vricos further advised plaintiff that he had inappropriately conducted a posttest and final examination review for the course and that it was also inappropriate for the posttest and final examinations to be given online. Plaintiff was terminated on

29

June 1, 2019 for the alleged Keiser University policy violations involving the posttests and the final examinations.

109.    During the May 6th meeting, plaintiff advised Blanton that, during his nine years as an instructor at Keiser University, plaintiff had routinely alternated between giving his reviews for final exams and posttests online, in the Blackboard system, and in the classroom, at his own discretion.    All the procedures had been documented in Blackboard and the resultant documents had been handed in to the Registrar's Office at the end of every term.

110.    Plaintiff, who had been supervised by Blanton for several years, reported directly to Blanton during that period and had bi-weekly meetings with Blanton at that time during which plaintiff provided Blanton with the lesson plans for each and every week for the 12 annual classes plaintiff taught during that time.    Plaintiff had never been advised by Blanton that the methods plaintiff had been using to conduct and administer test reviews and examinations had been inappropriate.

111.    Prior to the creation of the hostile work environment, plaintiff's pretest, posttest, and testing reviews and procedures had never been questioned for the nine years plaintiff was employed at Keiser University.

112.    After plaintiff's termination, during an August 8, 2019 State of Florida unemployment benefits appeal hearing conducted other oath, an administrative law judge asked Blanton what had prompted him to suddenly review plaintiff's posttest review procedures after plaintiff had been teaching in the same manner for nine years. Blanton was unable to give a substantive answer.

30

113.    During the years Blanton was plaintiff's immediate supervisor, plaintiff provided Blanton with detailed information regarding his lesson plans and procedures, including conducting plaintiff's classes and online activities via Keiser University's email system and Blackboard class management system. Blanton never advised plaintiff that he was in violation of any Keiser University policies and plaintiff had no knowledge that he was participating in any inappropriate procedures, including posttest and final exam reviews, which plaintiff routinely conducted in class, through email and via the Blackboard system.

114.    In the May 6, 2019 meeting, plaintiff explained to Blanton and Vricos that he had used the same posttest review and administration procedures for all of the twelve courses plaintiff had taught each academic year for nine years, without being advised by any supervisor, Blanton included, that plaintiff was in violation of Keiser University policy. Despite that, the manner in which plaintiff reviewed and administered the posttest for the evening Criminal Justice course plaintiff taught was used as grounds to terminate plaintiff.

115.    In the meeting of May 6, 2019, Blanton advised plaintiff that to attach or place a quiz in the Keiser University email was a breach of policy that amounted to a flagrant, blatant violation of security protocol. Plaintiff advised Blanton that he had never been informed that to list or place a quiz, test or a review in the Keiser University email system was a violation of policy.

116.    Blanton, while he was the Program Director of the Biomedical Sciences Program at Keiser University's Tampa campus, sent an email to Hedayat in which Blanton had attached a class quiz. Blanton was never disciplined or reprimanded for the violation.

117.    Blanton also alleged that plaintiff had violated student confidentiality by placing posttest review material in university email.  Plaintiff had never previously been advised that placing test review material in university email was a violation of student confidentiality.

118.    Former Associate Dean Glenn Perrotte, while he was plaintiff's supervisor, sent plaintiff a Keiser University email that had, as an attachment, the private and personal (non-Keiser) email addresses of eighteen students.  No disciplinary action was taken against Perrotte for his violation of student confidentiality by emailing plaintiff the private email addresses of eighteen students.

119.    On June 26, 2019 Blanton and Barnhill, in their unsuccessful attempt to bar plaintiff's receipt of unemployment benefits, submitted written statements to the State of Florida which alleged that, prior to plaintiff's termination, plaintiff had received several prior warnings regarding his posttest procedures.

120.    In the State of Florida unemployment benefits appeal hearing of August 8, 2019, Blanton testified under oath that plaintiff had never been given any prior warnings regarding his posttest procedures, proving that his earlier written  statement to the State of Florida had been knowingly false.

121.    In the meeting of May 6, 2019 with Blanton and Vricos, the topic of plaintiff's class' April 25th absence was never discussed or mentioned in any manner by Blanton or Vricos.  Yet, in their June 26, 2019 written statement submitted to the State of Florida, Blanton and Barnhill alleged that plaintiff advised his students not to attend class on April 25th and their absence was part of the grounds for plaintiff's termination.

122.    The allegation of plaintiff advising the students in his April 2019 Ethics in Criminal Justice course not to attend class is false.

123.    At the time of plaintiff's termination, Blanton and Barnhill violated Section 3-13 (Performance Review) of Keiser University's Employee Handbook which states that an employee who is alleged to have committed a policy violation, unless (s)he is immediately discharged, will receive an "improvement needed" notification upon discovery of the alleged violation.  At that time the employee is placed on notice that if improvement is not shown by a date determined by the evaluator, at which time (s)he will be reviewed again, (s)he receives an "unsatisfactory" evaluation and termination may result.

124.    At the time of Blanton's allegations against plaintiff on May 6, 2019, plaintiff was not given an opportunity to address and correct the alleged violation as per the employment handbook guidelines.  However, neither was plaintiff immediately discharged, and plaintiff was permitted to teach the next term's class without supervisory review or monitoring of any kind, despite the serious procedural allegations lodged against plaintiff.

125.    Blanton, following the May 6, 2019 meeting in which he accused plaintiff of deliberate and serious violations and security breaches of Keiser University policies, did not take any measures, nor did he direct Associate Dean James Vricos to take any measures to make certain that plaintiff did not commit any such alleged acts again.

126.    The failure of defendants to supervise or monitor plaintiff in any manner during the next academic term following the allegations of serious breaches of protocol, policy

and student confidentiality against plaintiff fully illustrate the contrived, fabricated, baseless, racially-motivated nature of the allegations made against plaintiff.

127.  The failure of defendants to "immediately discharge" plaintiff as per Keiser University policy for the alleged "serious breaches of protocol, policy and student confidentiality" fully illustrate the contrived, fabricated nature of the allegations against plaintiff.

128.  Blanton and Barnhill's written June 26, 2019 response to the State of Florida's question as to why plaintiff was not immediately discharged following their discovery of his "violations" was because:

  a.  an investigation needed to be done

  b.  HR approval was required before plaintiff could be terminated.

129.  Their statements are blatantly false.

130.  No investigation was done. During their sworn testimony on August 8, 2019, neither Blanton nor Barnhill could explain what "investigation" was conducted during the month-long interval between the May 6, 2019 meeting and plaintiff's termination.

131.  Testifying under oath on August 8, 2019, Barnhill stated that he and Blanton received HR's approval to terminate plaintiff on June 4, 2019.

132.  Barnhill's statement made under oath was blatantly false. Plaintiff was terminated on June 1, 2019. According to Barnhill's response made under oath, Barnhill and Blanton received the "required" HR approval to terminate plaintiff three days after plaintiff had already been terminated.

133.  No HR approval of plaintiff's termination was given prior to plaintiff's termination. In the week after plaintiff's termination, plaintiff contacted HR at which time Senior

HR Specialist Kelly McGougan advised plaintiff that the HR office had no knowledge of plaintiff's termination and had given no approval to Blanton and Barnhill for plaintiff's termination.

134.    Approximately six days following plaintiff's termination for alleged egregious and serious policy violations, including protocol violations and major security breaches of Keiser University's email system, plaintiff continued to have access to Keiser University's email network and Blackboard class management system.

135.    On or about July 2, 2019, plaintiff was advised by the State of Florida Department of Economic Opportunity that Keiser University had contested plaintiff being awarded unemployment benefits because plaintiff had willfully committed "misconduct" and "insubordination" that resulted in his termination.

136.    The State of Florida, after a comprehensive investigation, approved plaintiff's receipt of benefits, stating in the official Notice of Approval "The discharge was for reason other than misconduct connected with the work."

137.    During the State of Florida unemployment benefits appeal hearing of August 8, 2019, Blanton and Barnhill stated, under oath, that

a.  they could not provide proof or documentation that plaintiff was ever advised that plaintiff needed approval to give an online examination for an on-ground class. Blanton and Barnhill had previously stated in their June 26, 2019 written statement to the State of Florida that plaintiff had willfully violated this known policy

b.  during the meeting of May 6, 2019 with Blanton and Vricos, plaintiff was never accused of misconduct or insubordination nor were the terms ever mentioned

c.  plaintiff had never been given prior warnings about the alleged violations, which directly conflicts with their written statements submitted to the State of Florida on June 26, 2019 in which they stated plaintiff had been given several prior warnings

d.  plaintiff was not dismissed immediately upon discovery of the alleged violations, even though they had stated in their written application for an appeal that the alleged deliberate violations committed by plaintiff warranted the immediate dismissal of plaintiff

e.  plaintiff was allowed to teach class for the next term

f.  Plaintiff's classroom activities for the next term were not monitored by supervisory personnel after the May 6, 2019 meeting

g.  Plaintiff's quiz and exam review procedures for the next term were not reviewed by supervisory personnel after the meeting of May 6, 2019

h.  Plaintiff's posttest review procedures were not monitored or reviewed by supervisory personnel after the meeting of May 6, 2019, despite plaintiff's posttest review procedures being the alleged reason for plaintiff's termination

i.  Neither Blanton, Barnhill nor Vricos reviewed plaintiff's posttest review procedures for the next class plaintiff taught after the meeting of May 6, 2019 to determine if plaintiff had violated the procedures that were the alleged reason for plaintiff's termination

j.  Blanton nor Barnhill directed James Vricos, plaintiff's immediate supervisor at the time of his termination, to monitor any of plaintiff's activities or procedures to

36

ensure that the violations alleged to have been committed by plaintiff were not repeated by plaintiff

k. Nether Blanton nor Barnhill could explain what "investigation" was conducted during the month-long interval between the May 6, 2019 meeting and plaintiff's termination

l. Plaintiff's Blackboard privileges and Keiser email privileges were not suspended after his June 1st termination and he had access to them for nearly an additional week, despite the serious allegations of security and confidential policy breaches made against plaintiff

138. No allegations of acts of misconduct or insubordination of any kind by plaintiff were mentioned or discussed by Blanton and Vricos during the meeting of May 6, 2019 or during plaintiff's termination on June 1, 2019, yet Blanton and Barnhill's written statements submitted to a State of Florida unemployment benefits Claims Adjudicator investigator advised that misconduct and insubordination were the justifications for plaintiff's termination.

139. When plaintiff reported his termination to the HR department and an investigation was begun, Blanton advised HR that the reason for plaintiff's termination was for violations of posttest review procedures. However, when the State of Florida unemployment benefits investigator interviewed Blanton, Blanton advised that plaintiff was terminated for misconduct and insubordination.

140. Blanton, Barnhill and Vricos were and are fully aware of the numerous violations of Keiser University rules, regulations and policies committed by Luis Fernandez. The failure of Blanton, Barnhill or Vricos to discipline Fernandez in any manner for the

multiple serious violations he committed illustrates, demonstrates and confirms the inequitable, discriminative manner in which plaintiff was treated and ultimately terminated.

141. Although the academic term-length, multiple violations Fernandez committed shortly before the allegations were made against plaintiff were more numerous and egregious than those alleged against plaintiff, Fernandez was not disciplined in any manner by Blanton, Barnhill and Vricos. The disparity in treatment due to plaintiff's race serves as proof of the discriminatory practices perpetrated against plaintiff.

142. On August 8, 2019 Blanton stated, under oath, that he agreed with and equally enforced the Keiser University policy in the employee handbook that stated "a deliberate omission, falsification, or fraudulent alteration of any document or record was grounds for immediate dismissal."

143. However, neither Blanton, Barnhill nor Vricos took any disciplinary action against Fernandez despite their knowledge of the fact that Fernandez deliberately omitted, falsified, and fraudulently altered multiple documents in the official Keiser University Campus Nexus/Campus Vue record and the Blackboard course management system.

144. Blanton's and Barnhill's hostile reaction to plaintiff's objection to the discriminatory actions of promoting of a less-qualified, less-experienced non-African American individual to a supervisory position that they denied plaintiff the opportunity to apply for and that had not been previously advertised as available, is proof of their discriminatory actions toward plaintiff based on his race.

145. Blanton's and Barnhill's untruthful, contrived and race-based reasons for denying plaintiff the opportunity to apply for the supervisory position awarded to Hedyat, and

their continued race-based denial of allowing plaintiff the opportunity to apply for a Program Director's promotion that he was the most qualified for, is further proof of their discriminatory actions toward plaintiff based on his race.

146.    Blanton's and Barnhill's deceptive, inconsistent, duplicitous and untruthful reasons given for plaintiff's termination is further proof of their discriminatory actions toward plaintiff based on his race.

147.    Blanton's and Barnhill's deceptive, inconsistent and untruthful responses to the State of Florida investigator's questions, their untruthful testimony given while under oath, and the hostile work environment created by Blanton and Barnhill toward plaintiff in retaliation for plaintiff exercising protected rights under the U.S. Constitution is further proof of their discriminatory actions toward plaintiff based on his race.

148.    Blanton's and Barnhill's and Vricos' failure to discipline a non-African-American instructor who had, shortly before allegations were lodged against plaintiff, committed multiple, more egregious violations than those alleged against plaintiff, and the retaliatory termination of plaintiff is further proof of the discriminatory actions against plaintiff based on his race.

149.    Everglades College, Inc. is liable for the acts of their agents and employees as set forth herein.

150.    Everglades College, Inc., Blanton and Barnhill took discriminatory and retaliatory actions against plaintiff.

151.    Blanton and Barnhill made untruthful, degrading written and verbal statements against plaintiff in the course and scope of their employment at Everglades College, Inc.

39

152.    The defendants are joint tortfeasors, jointly and severally liable to plaintiff for his injuries.

### COUNT 1 – Racial Discrimination in the Making and Enforcement of Contracts 42 U.S.C § 1981

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1 through 152.

153.    By committing the actions alleged, defendants denied plaintiff the same right to make and enforce employment contracts-which includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship-as enjoyed by plaintiff's counterparts, because of plaintiff's race.

154.    The actions complained of have deprived plaintiff of equal employment opportunities and adversely affected plaintiff's employment because of his race.

155.    In discriminating against plaintiff because of his race, defendants acted with malice or callous indifference to plaintiff's federally protected rights.

156.    Plaintiff has been injured by defendants as a result of the violations as alleged, including pain and suffering, emotional distress, mental anguish, loss of capacity to enjoy life, loss of self-efficacy, and economic damages.

157.    The unlawful employment practices complained of were intentional and

158.    continuing in nature.

159.    Plaintiff demands all relief that is just and equitable, including compensatory damages, cost, and fees as provided by 42 U.S.C § 1988.

## COUNT 2 – Retaliation 42 U.S.C § 1981

Plaintiff re-alleges paragraphs 1 through 159 and states additionally or alternatively:

160.   On or about April 17, 2017, plaintiff opposed and complained to Blanton and Barnhill about unlawful racial discrimination against him.

161.   Plaintiff's complaints comprised protected activity under 42 U.S.C § 1981.

162.   At or about the time plaintiff engaged in the protected activity, defendants were aware of plaintiff's protected activity.

163.   Defendants Blanton and Barnhill harassed and intimidated plaintiff for objecting to unlawful discrimination and harassment.

164.   On June 1, 2019, defendants Blanton, Barnhill and Everglades College, Inc. fired plaintiff for alleged violations.

165.   Defendants took adverse employment actions against plaintiff in retaliation for engaging in the protected activity.

166.   A reasonable employee would have found defendants' retaliatory actions materially adverse, as did plaintiff.  Defendants' retaliatory actions against plaintiff would dissuade a reasonable employee from protected conduct or activity.

167.   By retaliating against plaintiff, defendants denied plaintiff the same right to make and enforce employment contracts-which includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship-as enjoyed by white citizens.

168.   By retaliating against plaintiff, defendants subjected plaintiff to punishment, pains, penalties, and extractions of every kind less than those to which defendants subject

similarly situated white citizens; and defendants did so because of plaintiff's protected activity.

169. By retaliating against plaintiff, defendants denied plaintiff the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens; and defendants did so because of plaintiff's protected activity.

170. In retaliating against plaintiff, defendants acted with malice or callous indifference to plaintiff's constitutionally protected acts.

171. Plaintiff has been injured by defendants as a result of the violations as alleged, including pain and suffering, emotional distress, mental anguish, loss of the capacity to enjoy life, loss of sense of self-efficacy, and economic damages.

172. Plaintiff demands all relief that is just and equitable, including compensatory damages, costs, and fees as provided by 42 U.S.C § 1988

**COUNT 3 – Defamation of Character, Slander and Libel by Blanton and Barnhill**

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1 through 172.

173. Plaintiff worked at Everglades College, Inc. and defendants Blanton and Barnhill were supervisory personnel who worked at Everglades College, Inc.

174. After plaintiff's termination, plaintiff applied for unemployment benefits with the State of Florida in June of 2019.

175. Later that same month, Blanton and Barnhill filed an appeal to the State of Florida in opposition to plaintiff's receipt of unemployment benefits.

176.    Blanton and Barnhill falsely testified under oath during a State of Florida unemployment benefits appeal hearing that plaintiff had willfully committed misconduct.

177.    Blanton and Barnhill falsely testified under oath during a State of Florida unemployment benefits appeal hearing that plaintiff had committed acts of willful insubordination.

178.    Blanton and Barnhill falsely testified under oath during a State of Florida unemployment benefits appeal hearing that plaintiff was "discharged for failing or refusing to adhere to a known company policy regarding insubordination."

179.    Blanton and Barnhill falsely testified under oath during a State of Florida unemployment benefits appeal hearing that plaintiff had failed to maintain the confidentiality of students and failed to maintain confidential information acquired in the course of plaintiff's work.

180.    Blanton and Barnhill submitted false written statements to the State of Florida alleging that plaintiff had willfully committed misconduct.

181.    Blanton and Barnhill submitted false written statements to the State of Florida alleging that plaintiff had willfully committed violations of testing policy after he had been issued several prior warnings.

182.    Blanton and Barnhill submitted false written statements to the State of Florida alleging plaintiff had committed acts of willful misconduct and insubordination.

183.    Blanton and Barnhill submitted false written statements to the State of Florida alleging that plaintiff was "discharged for failing or refusing to adhere to a known company policy regarding insubordination."

43

184.    Blanton and Barnhill submitted false written statements to the State of Florida alleging that plaintiff had failed to maintain the confidentiality of students and failed to maintain confidential info acquired in the course of plaintiff's work.

185.    Blanton and Barnhill made the false statements knowing they were false.

186.    Blanton and Barnhill submitted the false written statements to the State of Florida knowing they were false.

187.    As a proximate result of the verbal statements and written statements made by Blanton and Barnhill, plaintiff was professionally damaged.

188.    The defendants' false and malicious accusations caused plaintiff to suffer damages in the form of loss of reputation and the portrayal of plaintiff's job performance in a false light.

### COUNT 4 – Civil Conspiracy – Blanton and Barnhill

Plaintiff incorporates by reference the allegations of all paragraphs as if fully set forth in this paragraph.

189.    Defendant Everglades College, Inc., namely its employees, agents, assigns, including Blanton and Barnhill conspired together in a scheme to defame, discredit and terminate plaintiff.

190.    The above-named defendants acted in concert and at the behest of one another to terminate plaintiff.

191.    In pursuance of the conspiracy, each of the above-named defendants contrived, fabricated and manufactured and testified to false allegations in order to concoct a justification for plaintiff's termination.

44

192.    During the time of plaintiff's employment with defendant Everglades College, Inc., defendants conspired in an unlawful act of discrimination and retaliatory termination against plaintiff.

193.    Defendants agreed and worked together in furtherance of a plan to terminate plaintiff's employment for pretextual reasons by knowingly providing inaccurate and improper information with the intent of damaging Plaintiff.

194.    As a result of defendants agreed-upon and shared acts, plaintiff was terminated from his employment and also otherwise damaged.

195.    All of the above-named defendants have received compensation and/or benefits, directly or indirectly (e.g. keeping their, jobs, additional pay, title, etc.) from having their scheme carried out, as a result of plaintiff's termination.

196.    As a direct and proximate result of the civil conspiracy committed by all of the above-named defendants, plaintiff has been damaged.

### COUNT 5 – Intentional Infliction of Emotional Distress by Defendant Everglades College, Inc., Blanton and Barnhill

Plaintiff re-alleges and incorporates herein the factual allegations contained in paragraphs 1 through 196.

197.    From 2017 to 2019, the defendant subjected plaintiff to a scheme to terminate him following nine years of employment and exemplary performance.

198.    Everglades College, Inc. and the defendants took action to end plaintiff's employment weeks after plaintiff had initiated a valuable relationship with a local forensic research facility that would have created a unique and prestigious partnership

between Everglades College, Inc. and a cutting-edge research facility and law enforcement training center.

199.    Everglades College, Inc. took action to end plaintiff's employment weeks after plaintiff had addressed the entire faculty pertaining to the unique educational and externships possibilities that the partnership with the research facility would create.

200.    Multiple instructors approached plaintiff in the weeks after his address and expressed their congratulations for his proactive approach in developing the relationship and their eagerness for their students to begin benefitting from the relationship.

201.    Plaintiff was neither offered nor asked to resign or retire.  Plaintiff was not offered a severance package.  Rather, plaintiff was subjected to false and disparaging statements, abused and maligned, overlooked for promotion, intimidated and terminated.

202.    The total sum of defendant's actions to terminate plaintiff was intentional and willful and calculated to humiliate and degrade plaintiff.

203.    The actions of defendant resulted in direct and significant injury to plaintiff.

204.    As a direct result and proximate result of the intentional and willful acts of defendant Everglades College, Inc., the plaintiff was injured and suffered damages to include, but not limited to, pain and suffering, mental anguish, and loss of enjoyment of life.

**COUNT 6- Vicarious Liability of Defendant Everglades College, Inc. for the Intentional acts of Defendants Blanton and Barnhill**

Plaintiff re-alleges and incorporates herein any and all factual allegations contained in this complaint.

46

205.    The conduct of defendants Blanton and Barnhill were done in furtherance of the agency relationship that existed between the defendants and Everglades College, Inc., therefore, Everglades College, Inc. is liable for the intentional acts of the defendants by virtue of their agency relationship.

206.    Additionally, the defendants' conduct was in furtherance of Everglades College Inc.'s plan to terminate plaintiff. Accordingly, Everglades College, Inc. is vicariously liable for the defendants' intentional acts due to their employee relationship.

207.    As a direct and proximate result of the defendants' intentional acts, plaintiff suffered injury, pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent or continuing and plaintiff will suffer the losses in the future.

## DAMAGES

208.    As a direct result of the defendants' acts and omissions, plaintiff suffered damages for which the defendants are jointly and severally liable. The damages sought are within the jurisdictional limits of this court.

209.    Plaintiff prays that he recover from the defendants actual damages, statutory damages, general damages, special damages, nominal damages, punitive damages, expenses, costs of court and all other relief, ether general or special, at law or in equity, to which he is entitled.

210.    In addition, plaintiff seeks fees, pre-judgment and post-judgment interest, and costs of court as allowed by law.

## JURY DEMAND

211.    Plaintiff hereby demands a jury trial on all issues that can be submitted to a jury.

## RELIEF REQUESTED

WHEREFORE, premises considered, plaintiff respectfully requests judgment against the defendants for the following: (1) actual damages; (2) fees; (3) exemplary damages; (4) punitive damages, as applicable; (5) pre-judgment and post-judgment interest; (6) court costs; and (7) any such other and further relief in law and in equity as this Court may deem just and proper.

Respectfully submitted this ___ day of December, 2020

Leon Johnson
14203 Cheshire Acres PL
Tampa, FL 33618
(256) 656-1468

## VERIFICATION

Personally appeared before the undersigned, LEON JOHNSON, who first being duly sworn, deposes and says that the allegations of this Verified Complaint for damages and Demand for Jury Trial, consisting of paragraphs 1 through 211, inclusive, are true and correct to the best of his knowledge, information and belief.

_____
LEON JOHNSON

STATE OF FLORIDA              )
COUNTY OF HILLSBOROUGH    )

The foregoing instrument was acknowledged before me this __23__ day of December, 2020, by LEON JOHNSON, who is either personally known to me or who produced Florida Driver's license number **J525-527-53-328-0** as identification, and who did take an oath.

_____
Notary Public State of Florida

My commission expires: January 12, 2021

49